IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT ARKANSAS
WESTERN DIVISION

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAY 2 6 2015

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

CGB DIVERSIFIED SERVICES, INC.                                    PLAINTIFF

VS.                    CASE NO. *4:15cv291 Swww*

BOBBY MILLS; U.S. CROP INSURANCE, LLC;
and VERNITA MORELAND                                    DEFENDANTS

This case assigned to District Judge *Wright*
and to Magistrate Judge *Volpe*

**COMPLAINT**

Plaintiff CGB Diversified Services, Inc., for its complaint against defendants Bobby Mills, U.S. Crop Insurance, LLC, and Vernita Moreland states:

THE PARTIES

1.      CGB Diversified Services, Inc. (CGBDS) is a Louisiana corporation registered to do business in Arkansas.  Its principal place of business is in St. Tammany Parish, Louisiana.  At all relevant times, it maintained an office in Searcy, White County, Arkansas.

2.      Bobby Mills ("Mills") is an individual residing in Searcy, White County, Arkansas.

3.      U.S. Crop Insurance, LLC ("U.S. Crop"), is an Arkansas limited liability company with its principal place of business in Searcy, White County, Arkansas.  Its registered agent is defendant Bobby Mills of Searcy, White County, Arkansas.

4.      Vernita Moreland ("Moreland") is an individual residing in Dumas, Desha County, Arkansas.

1

JURISDICTION

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

BACKGROUND

6.     CGBDS is a risk management company that provides, among other things, insurance agency services for the sale and placement of crop insurance policies to and for farmers through private insurance products and through the Federal Crop Insurance Corporation (FCIC) program.  CGBDS sells crop insurance policies to customers throughout (among other places) Arkansas and Missouri.

7.     Mills and Moreland are former employees of CGBDS.

8.     Prior to his employment at CGBDS, Mills was the principal owner of U.S. Crop, an insurance agency in Searcy, Arkansas that sold and placed crop insurance policies to and for farmers.

9.     On or about February 4, 2013, CGBDS entered into a contractual agreement (the "Purchase Agreement") with Mills and U.S. Crop whereby Mills and U.S. Crop agreed to, among other things, sell their book of crop-insurance business and accompanying good will to CGBDS (the "Good Will" and the "Book of Business").  A true and correct copy of this agreement is attached as Exhibit "1."

10.     In consideration for the Good Will and Book of Business, CGBDS agreed to pay a maximum of $2,430,000, provided certain conditions outlined in the Purchase Agreement were met.  *See* Exhibit "1," p. 1 (Purchase Agreement, art. I, sec. (a)).

2

11.     Ultimately, CGBDS paid $2,233,910 for, among other things, the Good Will and Book of Business.

12.     Pursuant to the Purchase Agreement, CGBDS agreed to employ Mills and Moreland as insurance sales agents under the job title "Risk Management Specialist." *Id.* at 2.  CGBDS also agreed to employ others who formerly worked at U.S. Crop. *Id.*

13.     Pursuant to the Purchase Agreement, Mills agreed that both he and "key employees" would execute separate agreements providing that they would not engage in competition with CGBDS while employed by CGBDS, or for a period of two years after their employment with CGBDS was terminated. *Id.* at 8.

14.     On or about February 4, 2013, Mills and Moreland signed their respective "Employment and Non-Compete Agreement," which governed the terms and conditions of Mills's and Moreland's employment with CGBDS.  True and correct copies of these agreements are attached as Exhibits "2" and "3."

15.     Under Paragraph 8 of their respective "Employment and Non-Compete Agreement," Mills and Moreland each agreed that, during their employment with CGBDS, they would not:

> [D]irectly or indirectly, manage, operate, control, invest in, accept employment with, or act in a consulting position with, or otherwise advise, assist, or be connected with, or directly or indirectly own or have any other interest in or right with respect to any enterprise that is in competition in any manner with the business of [CGBDS] or its affiliates.  Violation of this covenant will be cause for immediate termination of employment by [CGBDS].

16.     Further, Mills and Moreland each agreed that, for a period of two years after their employment, they would not:

[D]irectly or indirectly, own, manage, operate, join, control, or participate in the ownership, management, operation, or control of, or be connected with, in any manner, any business within the States of Missouri and Arkansas in any county where [CGBDS] does or did business, that shall be in competition with the business of [CGBDS] presently being conducted . . . .

17.     Further, Mills and Moreland each agreed that, for a period of two years after their respective employment with CGBDS ended, they would not solicit or contact customers of CGBDS with whom they worked while employed at CGBDS.

18.     Statewide Farmers Risk Management, LLC ("Statewide") is a direct competitor of CGBDS as it sells and places crop insurance policies to and for farmers throughout (among other places) Arkansas and Missouri.

19.     Paragraph 8 of the "Employment and Non-Compete Agreement" executed by Mills provided a narrow exception in regard to Statewide:

CGBDS recognizes that Bobby B. Mills may gain an ownership interest in Statewide Farmers Risk Management, LLC (Statewide) which is in the business of selling and servicing crop insurance in the same counties as CGBDS.  Any relationship with Statewide is excepted from the provisions of this Paragraph 8 *so long as no policies are transferred from the BOOK to Statewide while Bobby B. Mills is an employee of CGBDS and for a period of two years commencing on the last date of employment with CGBDS.*

*Id.* (emphasis added).  This exception was also included in Article VII of the Purchase Agreement.

20.     This exception regarding Statewide was not included in the "Employment and Non-Compete Agreement" executed by Moreland.

21.     Mills's and Moreland's employment by CGBDS as Risk Management Specialists commenced after they executed their respective "Employment and Non-Compete Agreement."

4

22.     Mills's and Moreland's job responsibilities as Risk Management Specialists for CGBDS included, among other things, selling crop insurance policies to customers in Arkansas and Missouri. These customers included: (a) the individuals and entities that comprised the Book of Business bought by CGBDS; (b) customers who had previously purchased crop insurance from CGBDS; and/or (c) potential customers who had not previously purchased crop insurance from CGBDS or U.S. Crop.

23.     Throughout their employment, CGBDS paid Mills and Moreland an annual base salary of $5,200 plus a commission on each crop insurance policy sold and serviced.

24.     Delta Crop Insurance, Inc. ("Delta Crop") is a direct competitor of CGBDS as it sells and places crop insurance policies to and for farmers throughout (among other places) Arkansas and Missouri.

25.     Upon information and belief, Mills and/or Moreland came to an agreement with Delta Crop, whereby Mills and/or Moreland would receive a commission or other compensation for causing and/or facilitating the transfer of insurance policies and/or customers from CGBDS to Delta Crop for the 2015 crop year.

26.     Mills and/or Moreland transferred, sold, or otherwise facilitated the transfer or sale of crop insurance policies through Delta Crop for the 2015 crop year while each was employed by CGBDS and while each was bound by their respective non-compete agreements and fiduciary duties owed to CGBDS as their employer.

27.     Upon information and belief, Mills and/or Moreland received compensation for the transfer and/or sale of crop insurance policies through Delta Crop for the 2015 crop year, in each case while still employed by CGBDS and while bound by their respective non-compete agreements and fiduciary duties owed to CGBDS as their employer.

28.     Arkansas Property & Casualty Insurance Agency, Inc. ("AP&C") is a direct competitor of CGBDS as it sells and places crop insurance policies to and for farmers throughout (among other places) Arkansas and Missouri.

29.     Upon information and belief, Mills and/or Moreland came to an agreement with AP&C, whereby Mills and/or Moreland would receive a commission or other compensation for causing and/or facilitating the transfer of insurance policies and/or customers from CGBDS to AP&C for the 2015 crop year.

30.     Mills and/or Moreland transferred, sold, or otherwise facilitated the transfer or sale of crop insurance policies through AP&C for the 2015 crop year while each was employed by CGBDS and while each was bound by their respective non-compete agreements and fiduciary duties owed to CGBDS as their employer.

31.     Upon information and belief, Mills and/or Moreland received compensation for the transfer and/or sale of crop insurance policies through AP&C for the 2015 crop year, in each case while still employed by CGBDS and while bound by their respective non-compete agreements and fiduciary duties owed to CGBDS as their employer.

6

32.     Statewide is a direct competitor of CGBDS as it sells and places crop insurance policies to and for farmers throughout (among other places) Arkansas and Missouri.

33.     Upon information and belief, Mills and/or Moreland came to an agreement with Statewide, whereby Mills and/or Moreland would receive a commission or other compensation for causing and/or facilitating the transfer of insurance policies and/or customers from CGBDS to Statewide for the 2015 crop year.

34.     Mills and/or Moreland transferred, sold, or otherwise facilitated the transfer or sale of crop insurance policies through Statewide for the 2015 crop year while each was employed by CGBDS and while each was bound by their respective non-compete agreements and fiduciary duties owed to CGBDS as their employer.

35.     Upon information and belief, Mills and/or Moreland received compensation for the transfer and/or sale of  crop insurance policies through Statewide for the 2015 crop year, in each case while still employed by CGBDS and while bound by their respective non-compete agreements and fiduciary duties owed to CGBDS as their employer.

36.     Certain CGBDS customers, whose policies were transferred to, or who otherwise purchased crop insurance policies through, AP&C, Delta Crop, and/or Statewide for the 2015 crop year, were part of the Book of Business CGBDS purchased from Mills and U.S. Crop.

37.     In regard to these customers, Mills and/or Moreland canceled the respective insurance policies written through and/or by CGBDS in order to affect a

7

transfer to competing agencies, in each case constituting a deliberate act to conceal his/her actions and conduct in that regard.

38.     Mills and/or Moreland purposefully failed to update CGDBS's insurance database with information regarding certain customers' policies before the Sales Closing Date as a deliberate attempt to further conceal their actions and conduct with respect to the effective transfer of crop insurance policies to competing agencies.

39.     After CGBDS discovered the aforementioned conduct, it terminated the employment of Mills and Moreland on or about March 12, 2015.

40.     Mills and Moreland continue to solicit CGBDS's customers and sell insurance policies written by CGBDS's competitors.

## COUNT I:  BREACH OF CONTRACT – PURCHASE AGREEMENT (AS TO MILLS AND U.S. CROP)

41.     CGBDS realleges and incorporates by reference the preceding paragraphs as if fully restated herein.

42.     On or about February 4, 2013, Mills, U.S. Crop, and CGBDS entered into the Purchase Agreement.

43.     CGBD paid $2,233,910 for its purchase of the Book of Business and Good Will.

44.     While Mills was employed by CGBDS and after his termination, Mills and U.S. Crop have placed, sold and/or transferred crop insurance policies (and/or facilitated and/or caused the same), to and through CGBDS's competitors, for

8

customers that comprised the Book of Business and appropriated the Good Will for their own benefit.

45.    Mills's and U.S. Crop's conduct have deprived CGBDS of the value it reasonably expected to receive from the Book of Business and Goodwill for which it paid $2,233,910.

46.    Mills's and U.S. Crop's conduct constitute an intentional and material breach of their contract with CGBDS.

47.    Mills's and U.S. Crop's breach of contract was the direct and proximate cause of damages to CGBDS. CGBDS is entitled to recover these damages in an amount to be determined at trial.

## COUNT II: UNJUST ENRICHMENT
### (AS TO MILLS AND U.S. CROP)

48.    CGBDS realleges and incorporates by reference the preceding paragraphs as if fully restated herein.

49.    Pursuant to the Purchase Agreement, CGBDS paid $2,233,910 for the Book of Business and Good Will.

50.    CGBDS reasonably expected to receive value through the renewal of insurance policies and/or through increased sales of insurance policies to the customers that comprised the Book of Business.

51.    Mills's and U.S. Crop's conduct of selling, placing and/or transferring insurance policies to and through CGBDS's competitors (and/or causing or facilitating the same) for customers that comprised the Book of Business and appropriating the Good Will for their own benefit has deprived CGBDS of the value

it reasonably expected to receive from the Book of Business for which it paid $2,233,910.

52.     Based on Mills's and U.S. Crop's conduct, equity and good conscience dictate that they are not entitled to keep the $2,233,910 paid by CGBDS.

53.     GBDS is entitled to a return of the reasonable monetary value of the Book of Business and Good Will appropriated by Mills and U.S. Crop.

54.     Because Mills's conduct was conscious wrongdoing, Mills and U.S. Crop should be required to disgorge all money, profits, or gains they have individually or collectively received (including consequential gains received by selling, placing and/or transferring insurance policies through CGBDS competitors) in addition to returning the reasonable monetary value of the Book of Business and Good Will.

### COUNT III: BREACH OF CONTRACT – EMPLOYMENT AND NON-COMPETE AGREEMENT (AS TO MILLS AND MORELAND)

55.     CGBDS realleges and incorporates by reference the preceding paragraphs as if fully restated herein.

56.     Pursuant to the express terms of their respective "Employment and Non-Compete Agreement," Mills and Moreland were prohibited from engaging in competition with CGBDS while they were employed as Risk Management Specialists for CGBDS.

57.     Mills and Moreland breached their covenants not to compete with CGBDS by selling, placing and/or transferring crop insurance policies (or causing or

10

facilitating the same) through Delta Crop, AP&C, and/or Statewide for the 2015 crop year while employed by CGBDS.

58.     Pursuant to the express terms of their respective "Employment and Non-Compete Agreement," Mills and Moreland are prohibited for a period of two years beginning on March 12, 2015 from competing with CGBDS and from participating in any way in the operations of a business that provides services in competition with CGBDS.

59.     Mills and Moreland breached their covenants not to compete by continuing to act as sales agents or otherwise facilitating the sale and/or transfer and/or placement of crop insurance policies through other insurance agencies and/or companies in competition with CGBDS.

60.     Pursuant to the express terms of their respective "Employment and Non-Compete Agreement," Mills and Moreland are prohibited from soliciting CGBDS's customers, for whom Mills and Moreland provided services to while employed at CGBDS, for a period of two years following the termination of their employment with CGBDS on March 12, 2015.

61.     Mills and Moreland breached their covenants by continuing to solicit CGBDS's customers after their employment was terminated.

62.     The restrictive covenants set forth in the respective "Employment and Non-Compete Agreement" are reasonably necessary to protect CGDBS's legitimate business interests.

11

63.     CGBDS's legitimate business interests include (but are not limited to) its customer list, which is partially comprised of the Book of Business purchased from Mills and U.S. Crop.

64.     As a direct and proximate result of Mill's and Moreland's breaches of their respective "Employment and Non-Compete Agreement," CGBDS has sustained and will continue to sustain irreparable injury unless Mills and Moreland are enjoined.

65.     CGBDS lacks an adequate remedy at law to compensate it for its damages, which include but are not limited to, a reduction of CGBDS's existing business with its customers, loss of prospective relationships with new customers, lost sales, and damage to CGBDS's goodwill under its brand name.

66.     An injunction will not threaten the public health, safety, or welfare and, on balance, the harm to CGBDS if an injunction is not granted will far outweigh the harm to Mills and Moreland if an injunction is granted since the injunction will merely enforce their contractual obligations under their respective "Employment and Non-Compete Agreements."

## COUNT III:  BREACH OF FIDUCIARY DUTY
### (AS TO MILLS AND MORELAND)

67.     CGBDS realleges and incorporates by reference the preceding paragraphs as if fully restated herein.

68.     CGBDS placed trust and confidence in Mills and Moreland by employing them as Risk Management Specialists.

12

69.     As Risk Management Specialists, Mills and Moreland controlled a substantial portion of CGBDS's relationships with customers in Arkansas and Missouri and had access to confidential information related to those relationships.

70.     Mills and Moreland were employees and agents of CGBDS and performed services on CGBDS's behalf, such as soliciting business from current and potential customers on CGBDS's behalf.

71.     In their roles as Risk Management Specialists, Mills and Moreland owed a fiduciary duty to CGBDS in regard to matters within the scope of their employment and agency.

72.     While employed by CGBDS, Mills and Moreland breached their fiduciary duty to CGBDS by diverting company resources and by promoting and assisting CGBDS's competitors for their own benefit and the benefit of competing businesses.

73.     As a direct and proximate cause of Mills's and Moreland's breaches of fiduciary duty, CGBDS has sustained damages and will continue to be damaged in the future. CGBDS is entitled to recover these damages in an amount to be determined at trial.

JURY DEMAND

74.     CGBDS hereby demands a trial by jury on all issues so triable.

PRAYER FOR RELIEF

WHEREFORE, plaintiff CGB Diversified Services, Inc. respectfully requests that the Court grant the following relief:

13

(a)     An injunction enjoining Mills and Moreland from breaching the restrictive covenants stated in their "Employment and Non-Compete Agreements";

(b)     Restitution for Mills's and U.S. Crop's unjust enrichment;

(c)     Compensatory damages, past and future, in excess of $75,000 to compensate CGBDS for the breaches of contract and fiduciary-duty damages alleged herein;

(d)     Punitive damages for the breaches of fiduciary duties owed by Mills and Moreland;

(e)     An award of reasonable attorneys' fees and costs incurred in bringing this action; and

(f)     A grant of all other relief as the Court deems just and proper.

Respectfully submitted,

WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
(501) 371-0808
FAX: (501) 376-9442
E-MAIL:  ryoung@wlj.com;
         jkim@wlj.com;
         nesmaeilpour@wlj.com

By:_____
     Regina A. Young (96161)
     Jane A. Kim (2007160)
     Neemah A. Esmaeilpour (2012229)
     *Attorneys for Plaintiff*

14

## PURCHASE AGREEMENT

This Purchase Agreement ("Agreement") is made and entered on the 4ᵗʰ

day of February, 2013 among Bobby B. MILLS individually and U.S. Crop Insurance, LLC

with offices at Searcy, Arkansas (together "MILLS"), and CGB Diversified Services, Inc.

("CGBDS"), a Louisiana corporation with its principal offices at 1608A West Lafayette,

Jacksonville, Illinois 62650.

 Whereas, MILLS owns a book of crop insurance business, ("BOOK"), based out of

 Searcy, Arkansas.

 And,

 Whereas, MILLS wishes to sell its BOOK and CGBDS wishes to purchase same

 Now, therefore,

 In consideration of the promises and the mutual covenants, warranties and

 representations contained herein, the parties agree as follows:

**Article I: Consideration.**

 a) CGBDS agrees to pay MILLS a *maximum* of $2,430,000 for the Book of

  Business and related goodwill, as long as 2013 Projected Revenue meets

  certain criteria as described in Article II below.  Payment of the

  consideration described in this Article shall be due and payable as

  described in Article III hereafter whether Bobby B. Mills is an employee of

  CGBDS as of the due date or not.



b) CGBDS agrees to employ as full-time Sales Agents, on terms to be defined in individual written employment, non-compete and non-disclosure agreements, Bobby B. Mills, Michael Pounders and Vernita Moreland. These three Sales Agents will each receive annual base pay of $5,200 plus CGBDS benefits and commission calculated as outlined in each employee's separate Employment and Non-compete Agreement.

c) CGBDS agrees to employ as full-time Sales Agents, on terms to be defined in individual written employment, non-compete and non-disclosure agreements, Tonya Roper and Maranda Jackson. These two Sales Agents will each receive annual base pay of $25,000 plus CGBDS benefits and commission calculated as outlined in each employee's separate Employment and Non-compete Agreement.

d) For all Sales Agents, promotional items designed to be given to customers or prospects will be provided to the salesperson and paid for by CGBDS.

e) For all Sales Agents, the expenses of maintaining an office in Searcy, Arkansas will be paid by CGBDS.  See Article VI below.

f) To manage the Searcy office, process the policies and general administration of the BOOK, CGBDS agrees to employ Sherri Doan as a salaried employee with annual base pay of $45,000 plus CGBDS benefits and Angela Anderson as an hourly employee plus CGBDS benefits.

g) All employees will be hired as at-will employees and the terms will be further defined in individual written employment, non-compete and non-

disclosure agreements that will be executed prior to the employees start date with CGBDS.

**Article II: Recalculation of Value.**

The Maximum Price presented at Article I was determined by multiplying 2012 Projected Revenue by 1.15 and then multiplying that figure by 2.5. MILLS will not receive the Maximum Price unless the revenue achieved in the 2013 Reinsurance Year when calculated in September of 2013 is at least $972,000. The Recalculated (Final) Purchase Price will be the lower of the Maximum Price presented at Article I or 2013 Projected Revenue (see below) times 2.5.

After all the 2013 crop year acreage reports for policies making up the BOOK have been processed and accepted by the FCIC, the 2013 premium will be known and 2013 Projected Revenue can then be determined as follows:

1) For FCIC policies the Base Premium on the books of CGBDS will be subtotaled by policy type, and then multiplied times the projected SOFT CAP commission rate for that policy type. (See APPENDIX A for definition of terms)

2) For named peril products, (non-FCIC policies), hail premium will be calculated at 18% and all other premium including replant will be calculated at 10%.

3

3) For any 2013 policies NOT on the books of CGBDS, seller by August 31st, 2013 will provide to CGBDS copies of accounting detail received from the Company with whom the policies had been placed. From the detail CGBDS will calculate the revenue generated (or to be generated) from those policies in the form of commissions. This calculation will not include any processing fees or anticipated profit share to be received.

4) If any of the policies in the calculations at II.1), II.2) or II.3) were on the books of CGBDS in the 2012 crop year under an Agency Code other than #651-1528 (U.S. Crop Insurance, LLC) then the revenue generated from those policies will be determined using the same method as at II.1) or II.2) depending on the policy type.

5) 2013 Projected Revenue will be the sum of FCIC revenue calculated at II.1) plus the revenue calculated for the named peril products at II.2) plus the SOFT CAP commission expected from other Companies at II.3) minus the revenue from policies already on CGBDS Books in 2012 for other Agencies calculated at II.4).

**Article III: Payment**

Payments will be made by check or wire transfer to U.S. Crop Insurance, LLC in three (3) installments.  Closing will take place at a mutually agreeable location of the parties on or before 1/31/2013.  Following is the payment schedule:

1.  The first installment will be $243,000 paid at the closing.

2.  The second installment will be made September 1, 2013 and will be the Recalculated (Final) Purchase Price times 45% rounded to the nearest whole dollar minus the amount calculated at step II.3) above which is the Soft CAP commissions due from other Companies.

3.  The third installment will be made September 1, 2014 and will be the Recalculated (Final) Purchase Price less all previous payments and the allowance made for payments received from the other Companies.

The ability to achieve the maximum payment is primarily dependent on policy retention and the A&O rate in reinsurance year 2013, which is unknown at this time.

**Article IV:  CGBDS'S Representations and Warranties**.

CGBDS hereby represents and warrants to MILLS as follows:

(a)     CGBDS is a corporation duly organized, validly existing and in good standing under the laws of the State of Louisiana.

(b)     The terms, execution, performance and carrying-out of this Agreement by CGBDS have been duly authorized and CGBDS has taken all actions necessary to make this Agreement a legal, valid and binding obligation of

CGBDS, enforceable against it in accordance with its terms.  CGBDS and its officers have full corporate power to make and perform this Agreement and the transactions contemplated herein.

**Article V: MILLS' Representations and Warranties.**

MILLS hereby represents and warrants to CGBDS as follows:

(a)     U.S. Crop Insurance, LLC is an Arkansas Limited Liability Company.

(b)     The terms, execution, performance and carrying-out of this Agreement by MILLS has been duly authorized in accordance with its terms.  MILLS has full power to make and perform this Agreement and the transactions contemplated herein.

(c)     MILLS has good, valid, and marketable title to the BOOK, free and clear of all contracts to buy, options to buy, rights of first refusal, mortgages, charges, security interests and other liens, encumbrances and restrictions of any nature whatsoever.

(d)     There are no actions, lawsuits or proceedings of any kind threatened against the BOOK, U.S. Crop Insurance, LLC or Bobby B. MILLS relative to the BOOK, or the basis for any such actions, lawsuits, or proceedings.

(e)     At this time U.S. Crop Insurance, LLC and/or Bobby B. MILLS are not in default under or in violation of contracts being assigned to or assumed by CGBDS.  Any obligations that occur as a result of actions by MILLS prior to

6

the purchase date shall remain the obligation of MILLS and CGBDS shall assume no responsibility.

(f)    No consent, license or formal exceptions from, nor any filing, declaration or registration with any third party is necessary for MILLS' execution, delivery and performance of this Agreement, nor does this Agreement, nor any transaction contemplated hereby, conflict with or constitute a breach of any contract or agreement to which U.S. Crop Insurance LLC is a party or is bound.

(g)    MILLS shall remain responsible for any E&O claims for wrongful acts for policies sold prior to the 2013 crop year and should purchase and provide evidence to CGBDS that coverage is in place to cover any such claims.  This would include claims against U.S. Crop Insurance LLC, Bobby B. MILLS, or any former employee of the U.S. Crop Insurance, LLC.

**Article VI:  Conduct of Business Before and After Closing.**

MILLS covenants that before executing this agreement he has conducted business in the ordinary, usual and customary manner, and has not made any commitments in the trade except in the ordinary course of business consistent with past practices. Both parties desire to preserve intact present business relationships. All attempts will be made to get 100% of the policies transferred to CGBDS.  CGBDS will pay rent for the office and all expenses related to the maintenance of the office including business phone line(s), fax lines(s), internet service, postage, office

7

supplies, liability insurance and insurance on the office contents.   Other expenses CGBDS will pay include; dues and subscriptions, computers and related maintenance, printers, paper, supplies and coverage for errors and omissions for all CGBDS employees.  A separate agreement will be executed for the rental.

**Article VII: Customer Non-solicitation and Non-compete**

As a condition of MILLS' obligations under this agreement each key employee shall execute a separate written agreement in which the employee agrees, (assuming the Purchaser has not committed a material and continuing breach of this agreement and assuming the Purchaser does not sell its crop insurance division to any other party), that while employed by Purchaser and for a period of two years commencing on the last date of employment with Purchaser, if said employee voluntarily terminates employment with CGBDS or if they are discharged for cause, that employee will not, directly within the States of Missouri and Arkansas in any county wherein MILLS did business during the 2012 crop year, enter into or engage generally in competition with CGBDS in the business of crop insurance, either as an individual or as a partner or in a joint venture; as an employee or agent for any person; as an officer, director, or shareholder; or otherwise. CGBDS recognizes that Bobby B. Mills may gain an ownership interest in Statewide Farmers Risk Management, LLC (Statewide) which is in the business of crop insurance in the same counties.  This relationship is excepted from the provisions of this Article so long as no policies are transferred from the BOOK to Statewide while Bobby B. Mills is an employee of CGBDS and for a period of two

8

years commencing on the last date of employment with CGBDS. These covenants shall be construed as an agreement independent of any other provision of this Contract. The existence of any claim or cause of action of MILLS against Purchaser, whether predicated on this Contract or otherwise, shall not constitute a defense to the enforcement by Purchaser of this covenant.

**Article VIII: Confidentiality.**

CGBDS and MILLS shall keep in confidence any material or information furnished or disclosed to it or any of its affiliated companies by the other party in connection with this transaction.   CGBDS and MILLS recognize that such information or material has been provided solely for use in the negotiations and in their respective operations after the closing and will not be reproduced or divulged to third parties at any time.  All written materials will be returned to the appropriate party within 30 days should the sale fail to close.  This obligation of confidentiality shall remain a continuing obligation and shall survive the Closing (or Closing Date in the event this transaction does not close) for a period of two (2) years, but shall not apply to information that is (i) publicly available or otherwise in the public domain, or (ii) obtained from a non-party lawfully in possession of such information and subject to no confidentiality restrictions, or (iii) in the possession of the receiving party at the time of disclosure and subject to no confidentiality restrictions.

**Article IX: Miscellaneous.**

1.   Announcements of Sale:   No party shall issue any public announcement, promotional material or advertisement disclosing either the content of this Agreement or the fact that it was entered into without the prior written consent of the other.   Upon mutual written agreement between CGBDS and MILLS either party may announce the fact of the sale of the BOOK to its employees any time after the Agreement has been signed by both parties.

2.   Brokerage: Each party acknowledges that there have been no brokers or agents involved with this transaction.

3.   Additional Instruments: From time-to-time before or after Closing, either party shall, at the other party's reasonable request and without further consideration, execute and deliver, or cause to be executed and delivered, such instruments of transfer, assumption, conveyance and assignment in addition to those delivered at the Closings and take such other action as such party may reasonably request in order more effectively to consummate the transactions contemplated herein.

4.   Notices: Any notices required or permitted hereunder shall be effective on the mailing thereof if placed in the U. S. mail, certified or registered mail, return receipt requested and deposited postage prepaid addressed to:

MILLS:   Bobby B. MILLS                   CGBDS:   CGB Diversified Services, Inc.
           156 Honey Hill Loop                         1608A West Lafayette
           Searcy, AR  72143                           Jacksonville, IL 62650
           Tele: 870 219-7863                          Tele: 217-479-6000

10

A party may, from time-to-time, by written notice so given to the other parties in the manner prescribed herein change its address for further notices hereunder.

5.  Section Headings:  The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of the Agreement.

6.  Multiple Executions: This Agreement may be executed in any number of multiple originals and each such original so executed shall have the same force and effect as an original instrument.

7.  Invalidity:  If any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect the remaining provisions of the Agreement and the Agreement shall be construed as if such invalid, illegal and unenforceable provision or provisions had never been contained herein.

8.  Construction:  The Agreement shall be construed, enforced and governed in accordance with the laws of the State of Arkansas without giving effect to the conflicts of law provisions thereof.

9.  Survival of Representations and Warranties:  All representations, warranties, covenants and agreements of the parties contained in this Agreement, or in any instrument, opinion or other writing provided for in this Agreement, shall survive the Closing for a period of five years.

10. Assignment: The Agreement shall not be assigned or otherwise transferred, directly or indirectly, of operation of law or otherwise, by either MILLS or CGBDS without the prior written consent of the other parties.

11. Parties in Interest: All of the terms and provisions in this Agreement shall be binding upon, shall inure to the benefit of and shall be enforceable by and against MILLS and CGBDS, and their heirs, approved successors, and assigns.

12. Remedies: Except as expressly limited hereinabove, each party retains the right to enforce any and all other remedies available to it in law or at equity.

13. Entire Agreement: This Agreement constitutes the entire agreement between the parties and supersedes all prior agreements and understandings between the parties relating to sale of MILLS' BOOK, and there are no agreements, understandings, restrictions, warranties or representations among the parties relating to sale of MILLS' BOOK, other than those set forth herein.

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be duly executed in duplicate as of the day and year first above written.

CGB Diversified Services, Inc. (CGBDS)          U.S. Crop Insurance, LLC

By: _James McClelland_                          by: _____
James McClelland                                Bobby B. MILLS, individually,
Title: Vice President                               & for U.S. Crop Insurance, LLC

12

# APPENDIX A:  DEFINITIONS

- **AIP** – Approved Insurance Provider.  Insurance company that has a Standard Reinsurance Agreement, (SRA), with the FCIC

- **A&O payment** – FCIC payments to Approved Insurance Providers, (AIPs), or their Managing General Agents, (MGAs), for reimbursement of administrative and operating expenses incurred in the delivery of eligible crop insurance contracts to producers.  The rates and methodologies for maximum payments are shown in the most current Standard Reinsurance Agreement (SRA) between the Approved Insurance Providers and the USDA's Risk Management Agency. These payments are subject to a "CAP" which is calculated and made public before payments are made by the FCIC to the AIP or its MGA.  The CAP to be applied in the 2013 reinsurance year is dependent on total premium sold in the United States in the 2013 reinsurance year and is not known as of the date of this agreement.  (See APPENDIX B)

- **Base Premium** – For FCIC policies, it is the producer premium plus the risk subsidy plus the administration fee.  For private policies it is the producer premium plus the administration fee.

- **Book of crop insurance business** – (BOOK) a list of customers which includes names, policy numbers, coverage type and coverage level.  All indicating a commitment by that policy holder to do business with the entity referred to in this agreement as the owner of the business.

- **CAT LAE** – there is no A&O payment on catastrophic risk, (CAT), policies.  The USDA's Risk Management Agency reimburses providers for Loss Adjusting Expenses, (LAE), on these policies at the rate prescribed by the current Standard Reinsurance Agreement.

- **CGBDS** – CGB Diversified Services, Inc. (A Company of CGB Enterprises, Inc.)

- **FCIC – Federal Crop Insurance Corporation.**  Governmental Agency that administers the federal program and is supervised by the Risk Management Agency division of the US Department of Agriculture.  FCIC provides both the subsidy and reinsurance on eligible contracts.

13

- **Maximum Price** - 2012 Projected Revenue times one-hundred fifteen percent then times two and one-half.  ($845,217 x 1.15 x 2.5 = $2,430,000)

- **Recalculated (Final) Purchase Price** – the *LESSER OF* $2,430,000 or the 2013 Projected Revenue times two and one-half (2.5).  The total of all payments cannot exceed the Recalculated (Final) Purchase Price.

- **Reinsurance Year** – The term beginning on July 1 and ending on June 30 of the following year. The identifier is the year containing June.

- **Risk subsidy** – the portion of the policy premium that is paid by the Federal Crop Insurance Corporation, (FCIC), on behalf of the policy holder.

- **SOFT CAP commission rate** – 80% of the A&O or CAT LAE paid by the FCIC to CGBDS or any other AIP with whom policies were placed and calculated in accordance with the procedures outlined in the most recent Standard Reinsurance Agreement. (SRA).  See Appendix B for further discussion.

- **2012 Projected Revenue** – For FCIC buy-up policies it is the commissions *expected to be collected* by U.S. Crop Insurance, LLC on the BOOK for policies sold in the 2012 crop year. Revenue for non-FCIC policies is hail Base Premium times 18% or replant Base Premium times 10% with a separate calculation made for each policy.  2013 Projected Revenue is the FCIC amount plus the non-FCIC amount and was calculated to be $845,217.

- **2013 Projected Revenue** – Revenue produced by the BOOK from policies that cover the 2013 crop year and calculated as described in Article II of this Agreement.   2013 Projected Revenue must be at least $972,000 for the Seller to earn the Maximum Purchase Price.

## APPENDIX B: OTHER INFORMATION

**Additional information regarding A&O payments to CGBDS:**

The Standard Reinsurance Agreement (SRA) establishes the terms, roles and responsibilities for the Risk Management Agency (RMA) and insurance companies that participate in the Federal crop insurance program. In the summer of 2010 numerous changes were made to the SRA and agreed to by the participating companies.

One of the changes was the placing of a maximum, (CAP), on the amount of A&O payments that can be paid to insurance companies or their Managing General Agencies for yield and revenue policy types. Other policy types like County plans and CAT are not affected by the CAP. The maximum amount that can be paid to all insurance companies for the affected policy types in the 2013 crop year is $1.249 billion dollars. This rises gradually to $1.290 billion in 2015.

When it is possible to accurately do so, RMA will calculate the expected A&O payouts based on the "base rates" shown below and actual base premium for a particular reinsurance year. They will then compare that amount to the maximum amount and create a factor for the CAP if necessary. For example, if nation-wide base premium is in the $11 billion range, and that translates into expected A&O payments of around $2 billion, then we would be well over the maximum. To reduce $2.0 billion to the $1.249 billion, (CAP for 2013), RMA would need to apply a factor of 62.45%. ($2.0 x 62.45% = $1.249 billion.) Thus the rate received by CGBDS would be 62.45% of the rates shown as the base rates in the table below:

| Policy Section reference SRA section III | Policy type | A&O or LAE Base Rates | Subject to payout CAP |
|---|---|---|---|
| (a)(2)(F)i | Revenue policies | 18.5% | yes |
| (a)(2)(F)ii | Yield (APH) policies | 21.9% | yes |
| (a)(2)(C) | Catastrophic (CAT) | 6.0% | no |
| (a)(2)(D) i | Area plans – GRIP/GRP | 12.0% | no |
| Note: this list not intended to cover all policy types and provisions. Payments to Agents are also subject to additional maximums calculated as a percentage of the A&O collected by the insurance company in a particular state. | | | |

15

EMPLOYMENT AND NON-COMPETE AGREEMENT

THIS EMPLOYMENT AND NON-COMPETE AGREEMENT (Agreement) is made this _4ᵗʰ_ day of February, 2013, by and between CGB Diversified Services, Inc. a Louisiana corporation doing business as Diversified Crop Insurance Services ("Employer" or "Purchaser"), and Bobby B. Mills ("Employee"), who resides at 156 Honey Hill Loop, Searcy, AR 72143

WHEREAS, the Employee had previously been employed by US Crop Insurance, LLC ("Former Employer"), before entering into this Agreement, and

WHEREAS, the owners of Former Employer have sold their ownership of a Book of Crop Insurance Business (BOOK) to the Purchaser and Former Employer will no longer sell or service crop insurance policies as a part of that business, and

WHEREAS, in relation to said sale of the BOOK, Employee's services are no longer needed at the Former Employer and Employee desires to become employed by Purchaser, and Purchaser desires to employ Employee.

NOW, THEREFORE, in consideration of the mutual promises contained herein, Employer agrees to employ Employee, subject to the following terms, to which Employee agrees to abide:

1. **Employment and Duties.**  Employee will serve at the direction of the Employer in a full time employment position.  Employee acknowledges that he is a fiduciary of, and that he owes a fiduciary duty to, Employer, and Employee agrees to endeavor faithfully to further the interests of Employer.

Employer may provide, but is not required to provide, training, selling tools, and marketing materials to Employee.

2. **Compensation.**  While Employee is employed with Employer, he will be compensated at an annual base pay rate of $5,200.  Employee will also be eligible to receive commission for each crop insurance policy sold and serviced by the Employee.  Commission will be calculated at 50% of whatever CGBDS receives as Administrative and Operating expense reimbursement ("A&O"), Catastrophic Risk Loss Adjusting Expense ("CAT LAE") or other type of commission for each policy the sales agent sells and services.  Commissions are considered "earned" as of the sales closing date but only if the insured ultimately satisfies the premium obligation. Commissions are payable even if the Employee is no longer employed as a Sales Agent for the Employer. (unless Employee was dismissed for cause).  In December of each year calculations will be made to settle the commission for that crop year as closely as possible, but a slight adjustment may be needed later to account for actual A&O, CAT LAE or other type of commission received and/or premiums never paid by the insured.

Sales Agent will be expected to pay his own expenses of selling including but not limited to the following expenses: transportation, including vehicle gas, repairs, vehicle licensing and

EXHIBIT
_2_

insurance, meals (whether personal or for business), cell phone, entertainment, travel related expenses and the expense of keeping up all individual licenses. However, errors and omissions coverage will be provided, and paid for, by the Employer.

Employee's salary will be subject to all lawful deductions. In addition, Employee shall be eligible for participation in all vacation, sick leave, and other employee benefit plans that Employer makes available to employees, on the terms and conditions contained in such plans. Employer shall consider Employee to be a new employee for purposes of determining the benefits available to Employee under the benefit plans which Employer provides. Employer shall have no obligation to carry over and provide any unused vacation days, sick days, flex days or pay for holidays not taken which Employee's previous employer may have provided, and Employee acknowledges that Employee must address any issues relating to such unused benefits with that previous employer.

Employer may at its option set forth terms of Employee's compensation more fully in a separate written agreement.

3. **Trade Secrets.** Employee agrees not to disclose or use any proprietary, confidential, or trade secret information of Employer or its affiliates, whether Employee has that information committed to memory or it is embodied in writing or any other physical form, except in pursuit of the business activities and interests of Employer or its affiliates or with the prior written consent of Employer, which shall not be unreasonably withheld. For the purposes of this Employment Agreement, the phrase "proprietary, confidential, or trade secret information of Employer or its affiliates" means all information, not in the public domain, relating to the names and addresses of customers, suppliers, and referral sources, processes, formulas, research, ideas, inventions, discoveries, improvements, specifications, formulas, or any trade secret of, methods of doing business, costs or prices, or uses or betterments of Employer's products or services, business plans, strategies, operations, marketing studies, or any plan or method for the sale or marketing of Employer's products or services, proprietary computer programs and software, processes, and computer source codes, financial records, including Employer's sales, expenses and profits and any confidences, secrets, or other confidential business matter of Employer or its affiliates. Employee agrees to enter into separate, written non-disclosure agreements with more specific or comprehensive terms upon Employer's request.

4. **Intellectual Property.** Employer shall retain ownership of any and all intellectual property which Employee creates or causes to be created on its behalf during the term of employment.

5. **Return of Property.** Upon termination of Employee's employment, he agrees to immediately return to Employer any and all documents, software and computer files, and all of the materials or other things in Employee's possession, custody, or control which are the property of Employer, including but not limited to, computers, car, credit cards, cellular telephone, handheld devices, BlackBerry, I-Phone, I-Pad, keys, fobs, electronic access cards, company identification, and the like as may have been provided to Employee, as well as all copies (in whatever form) of all materials relating to Employee's employment, or obtained or created in the course of employment. Employee also specifically agrees to immediately return to

Employer all proprietary, confidential, intellectual property, and trade secret information as referenced herein, as well as all copies thereof (in whatever form).

6. **Termination of Employment.** There shall be no fixed date for termination of this employment agreement and it shall continue indefinitely until either Party desires to end the employment relationship. This is an "at will" employment contract wherein no cause is required for termination. Employee's employment with Employer under this Employment Agreement shall terminate on the occurrence of any of the following:

a)       Employee's death or legal incompetence.

b)       Employer's optional decision to terminate Employee's employment because of other physical or mental impairments that prevent Employee from performing services as contemplated by this Employment Agreement for more than sixty consecutive days.

c)       Discharge by Employer for cause, including without limitation any material breach of this Employment Agreement or any other duty owed to Employer or any of its affiliates, as determined in accordance with the laws of the State of Arkansas.

Paragraphs 6(a) through (c), which state circumstances under which Employee shall be terminated, shall not be interpreted to require cause for termination; the intent of said paragraphs is to describe circumstances under which Employer would terminate Employee. However, it is expressly agreed to and understood by the parties hereto that should Employee be fired without cause or if Employer should sell its crop insurance division to another party, then this Agreement is null and void.

7.       **Effect of Termination on Compensation.** On termination of Employee's employment with Employer in accordance with Paragraph 6, neither Employer nor its affiliates shall be under any further obligation to Employee under this Employment Agreement, except to pay Employee the salary and earned commissions at the rate provided in Paragraph 2 through the end of the month in which the termination takes place and to provide Employee with any benefits that may have accrued through the end of that month.

8.       **Noncompetition During Employment and After.** For the consideration identified in Paragraph 2, and as a condition of employment by Employer, Employee agrees that during the period of employment under this Employment Agreement, he will not in any way, directly or indirectly, manage, operate, control, invest in, accept employment with, or act in a consulting position with, or otherwise advise, assist, or be connected with, or directly or indirectly own or have any other interest in or right with respect to any enterprise that is in competition in any manner with the business of Employer or its affiliates. Violation of this covenant will be cause for immediate termination of employment by Employer. If Employee should desire to participate in any enterprise in any way that may or may not be permitted by this Employment Agreement, he shall notify Employer in writing prior to such participation, setting forth complete details of the proposed participation. Within thirty days after notification, Employer shall advise Employee

in writing whether it believes that such participation would be prohibited by the terms of this Paragraph 8. If it believes that such participation would be prohibited, Employer shall in the same writing either state the reasons for that belief or waive all rights under this Paragraph 8 regarding Employee's participation. Employer's failure to respond in writing to Employee within the thirty-day period shall constitute a waiver by Employer of all its rights under this Paragraph 8 regarding Employee's participation, but only as to the subject of the notification. No waiver by Employer of any rights under this Paragraph 8 regarding any particular participation shall constitute a waiver of its rights regarding any future or other participation.

CGBDS recognizes that Bobby B. Mills may gain an ownership interest in Statewide Farmers Risk Management, LLC (Statewide) which is in the business of selling and servicing crop insurance in the same counties as CGBDS. Any relationship with Statewide is excepted from the provisions of this Paragraph 8 so long as no policies are transferred from the BOOK to Statewide while Bobby B. Mills is an employee of CGBDS and for a period of two years commencing on the last date of employment with CGBDS.

Employee further agrees that, for a period of two years commencing on the last date of employment with Employer, he will not, directly or indirectly, own, manage, operate, join, control, or participate in the ownership, management, operation, or control of, or be connected with, in any manner, any business within the States of Missouri and Arkansas in any county wherein Former Employer does or did business, that shall be in competition with the business of Employer presently being conducted with the exception of, and the provisions stated in the preceding paragraph.

Employee further agrees and covenants not to contact, call on, or solicit any of Employer's customers for whom Employee provided services, on whom Employee called, with whom Employee became personally acquainted, or with whom Employee worked during employment with Employer, nor shall Employee make known to any competitive person or business entity, either directly or indirectly, the names or addresses of any such customers or any information relating in any manner to Employer's trade practices and secrets or business relationship with such customers, for a period of two years beyond the date of Employee's employment termination. Notwithstanding any other terms herein, the non-solicitation and non-disclosure covenant contained in this paragraph shall apply throughout the continental United States, and shall not be limited to any other geographic territory or radius defined elsewhere in this agreement.

9. **Severability.** Any paragraph, sentence, phrase, or other provision of this Employment Agreement that is in conflict with any applicable statute, rule, or other law shall be deemed to be modified or altered to conform to the applicable statute, rule, or other law, if possible, or, if not possible, to be omitted from this Employment Agreement. The invalidity of any portion of this Employment Agreement shall not affect the force or effect of its remaining portions.

10. **Governing Law.** The validity, interpretation, and enforcement of this Agreement shall be governed by the laws of the State of Arkansas. This Agreement shall be construed without regard to any presumption or rule requiring construction against the party causing this document

Employment and Non-Compete Agreement
Page 5 of 5

to be drafted. If any provision of this Agreement or the application thereof to any party is held invalid or unenforceable for any reason, the other provisions of this Agreement and their application shall be unaffected thereby, and shall remain in full force and effect.

Employee, to the full extent permitted by law, hereby knowingly, intentionally, and voluntarily, with and upon the advice of competent counsel, (i) submits to personal jurisdiction in the State of Arkansas and venue of Woodruff County over any suit, action, or proceeding by any person arising from or relating to this Agreement and (ii) agrees that he will not bring any action, suit or proceeding against Employer in any other forum. Employee further consents and agrees to service of any summons, citation, complaint or other legal process in any such suit, action, or proceeding by registered or certified U.S. Mail, return receipt requested, or postage prepaid, addressed to her at the address set forth above, and consents and agrees that such service shall constitute in every respect valid and effective service (but nothing herein shall affect the validity or effectiveness of process served in any other manner permitted by law).

11. **Counterpart Execution.** This Employment Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.

12. **Entire Agreement.** This Employment Agreement constitutes the entire understanding between Employee and Employer relating to the employment. This Employment Agreement shall be binding on and shall inure to the benefit of the parties to it and their respective heirs, executors, administrators, legal representatives, successors, and assigns, and shall inure to the benefit of the affiliates of Employer and their respective successors and assigns.

AGREED AND ACCEPTED BY THE UNDERSIGNED, WHO HAVE READ THE FOREGOING DOCUMENT, HAVE HAD THE OPPORTUNITY TO REVIEW IT WITH THEIR CHOSEN COUNSEL, FULLY UNDERSTAND IT, AND WHO INDIVIDUALLY WARRANT THEIR AUTHORITY TO EXECUTE IT AS OF THE DATE ABOVE.

CGB DIVERSIFIED SERVICES, BY:

_____
Signature

Jeff Baumgart
Printed Name

EMPLOYEE BY:

_____
Signature

Bobby Brad Mills
Printed Name

EMPLOYMENT AND NON-COMPETE AGREEMENT

THIS EMPLOYMENT AND NON-COMPETE AGREEMENT (Agreement) is made this ___ day of February, 2013, by and between CGB Diversified Services, Inc. a Louisiana corporation doing business as Diversified Crop Insurance Services ("Employer" or "Purchaser"), and Vernita Moreland ("Employee"), who resides at PO Box 369, Dumas, AR  71639

WHEREAS, the Employee had previously been employed by US Crop Insurance, LLC ("Former Employer"), before entering into this Agreement, and

WHEREAS, the owners of Former Employer have sold their ownership of a Book of Crop Insurance Business (BOOK) to the Purchaser and Former Employer will no longer sell or service crop insurance policies as a part of that business, and

WHEREAS, in relation to said sale of the BOOK, Employee's services are no longer needed at the Former Employer and Employee desires to become employed by Purchaser, and Purchaser desires to employ Employee.

NOW, THEREFORE, in consideration of the mutual promises contained herein, Employer agrees to employ Employee, subject to the following terms, to which Employee agrees to abide:

1. **Employment and Duties.**  Employee will serve at the direction of the Employer in a full time employment position.  Employee acknowledges that she is a fiduciary of, and that she owes a fiduciary duty to, Employer, and Employee agrees to endeavor faithfully to further the interests of Employer.

Employer may provide, but is not required to provide, training, selling tools, and marketing materials to Employee.

2. **Compensation.**  While Employee is employed with Employer, she will be compensated at an annual base pay rate of $5,200.  Employee will also be eligible to receive commission for each crop insurance policy sold and serviced by the Employee.  Commission will be calculated at 50% of whatever CGBDS receives as Administrative and Operating expense reimbursement ("A&O"), Catastrophic Risk Loss Adjusting Expense ("CAT LAE") or other type of commission for each policy the sales agent sells and services.  Commissions are considered "earned" as of the sales closing date but only if the insured ultimately satisfies the premium obligation.  Commissions are payable even if the Employee is no longer employed as a Sales Agent for the Employer.  (unless Employee was dismissed for cause).  In December of each year calculations will be made to settle the commission for that crop year as closely as possible, but a slight adjustment may be needed later to account for actual A&O, CAT LAE or other type of commission received and/or premiums never paid by the insured.



EXHIBIT

3

Sales Agent will be expected to pay his own expenses of selling including but not limited to the following expenses: transportation, including vehicle gas, repairs, vehicle licensing and insurance, meals (whether personal or for business), cell phone, entertainment, travel related expenses and the expense of keeping up all individual licenses. However, errors and omissions coverage will be provided at the Employer's expense.

Employee's salary will be subject to all lawful deductions. In addition, Employee shall be eligible for participation in all vacation, sick leave, and other employee benefit plans that Employer makes available to employees, on the terms and conditions contained in such plans. Employer shall consider Employee to be a new employee for purposes of determining the benefits available to Employee under the benefit plans which Employer provides. Employer shall have no obligation to carry over and provide any unused vacation days, sick days, flex days or pay for holidays not taken which Employee's previous employer may have provided, and Employee acknowledges that Employee must address any issues relating to such unused benefits with that previous employer.

Employer may at its option set forth terms of Employee's compensation more fully in a separate written agreement.

3. **Trade Secrets.** Employee agrees not to disclose or use any proprietary, confidential, or trade secret information of Employer or its affiliates, whether Employee has that information committed to memory or it is embodied in writing or any other physical form, except in pursuit of the business activities and interests of Employer or its affiliates or with the prior written consent of Employer, which shall not be unreasonably withheld. For the purposes of this Employment Agreement, the phrase "proprietary, confidential, or trade secret information of Employer or its affiliates" means all information, not in the public domain, relating to the names and addresses of customers, suppliers, and referral sources, processes, formulas, research, ideas, inventions, discoveries, improvements, specifications, formulas, or any trade secret of, methods of doing business, costs or prices, or uses or betterments of Employer's products or services, business plans, strategies, operations, marketing studies, or any plan or method for the sale or marketing of Employer's products or services, proprietary computer programs and software, processes, and computer source codes, financial records, including Employer's sales, expenses and profits and any confidences, secrets, or other confidential business matter of Employer or its affiliates. Employee agrees to enter into separate, written non-disclosure agreements with more specific or comprehensive terms upon Employer's request.

4. **Intellectual Property.** Employer shall retain ownership of any and all intellectual property which Employee creates or causes to be created on its behalf during the term of employment.

5. **Return of Property.** Upon termination of Employee's employment, she agrees to immediately return to Employer any and all documents, software and computer files, and all of the materials or other things in Employee's possession, custody, or control which are the property of Employer, including but not limited to, computers, car, credit cards, cellular telephone, handheld devices, BlackBerry, I-Phone, I-Pad, keys, fobs, electronic access cards,

company identification, and the like as may have been provided to Employee, as well as all copies (in whatever form) of all materials relating to Employee's employment, or obtained or created in the course of employment. Employee also specifically agrees to immediately return to Employer all proprietary, confidential, intellectual property, and trade secret information as referenced herein, as well as all copies thereof (in whatever form).

6. **Termination of Employment.**  There shall be no fixed date for termination of this employment agreement and it shall continue indefinitely until either Party desires to end the employment relationship. This is an "at will" employment contract wherein no cause is required for termination. Employee's employment with Employer under this Employment Agreement shall terminate on the occurrence of any of the following:

     a)      Employee's death or legal incompetence.

     b)      Employer's optional decision to terminate Employee's employment because of other physical or mental impairments that prevent Employee from performing services as contemplated by this Employment Agreement for more than sixty consecutive days.

     c)      Discharge by Employer for cause, including without limitation any material breach of this Employment Agreement or any other duty owed to Employer or any of its affiliates, as determined in accordance with the laws of the State of Arkansas.

Paragraphs 6(a) through (c), which state circumstances under which Employee shall be terminated, shall not be interpreted to require cause for termination; the intent of said paragraphs is to describe circumstances under which Employer would terminate Employee. However, it is expressly agreed to and understood by the parties hereto that should Employee be fired without cause or if Employer should sell its crop insurance division to another party, then this Agreement is null and void.

7.      **Effect of Termination on Compensation.**  On termination of Employee's employment with Employer in accordance with Paragraph 6, neither Employer nor its affiliates shall be under any further obligation to Employee under this Employment Agreement, except to pay Employee the salary and earned commissions at the rate provided in Paragraph 2 through the end of the month in which the termination takes place and to provide Employee with any benefits that may have accrued through the end of that month.

8.      **Noncompetition During Employment and After.**  For the consideration identified in Paragraph 2, and as a condition of employment by Employer, Employee agrees that during the period of employment under this Employment Agreement, she will not in any way, directly or indirectly, manage, operate, control, invest in, accept employment with, or act in a consulting position with, or otherwise advise, assist, or be connected with, or directly or indirectly own or have any other interest in or right with respect to any enterprise that is in competition in any manner with the business of Employer or its affiliates. Violation of this covenant will be cause

for immediate termination of employment by Employer. If Employee should desire to participate in any enterprise in any way that may or may not be permitted by this Employment Agreement, she shall notify Employer in writing prior to such participation, setting forth complete details of the proposed participation. Within thirty days after notification, Employer shall advise Employee in writing whether it believes that such participation would be prohibited by the terms of this Paragraph 8. If it believes that such participation would be prohibited, Employer shall in the same writing either state the reasons for that belief or waive all rights under this Paragraph 8 regarding Employee's participation. Employer's failure to respond in writing to Employee within the thirty-day period shall constitute a waiver by Employer of all its rights under this Paragraph 8 regarding Employee's participation, but only as to the subject of the notification. No waiver by Employer of any rights under this Paragraph 8 regarding any particular participation shall constitute a waiver of its rights regarding any future or other participation.

Employee further agrees that, for a period of two years commencing on the last date of employment with Employer, she will not, directly or indirectly, own, manage, operate, join, control, or participate in the ownership, management, operation, or control of, or be connected with, in any manner, any business within the States of Missouri and Arkansas in any county wherein Former Employer does or did business, that shall be in competition with the business of Employer presently being conducted.

Employee further agrees and covenants not to contact, call on, or solicit any of Employer's customers for whom Employee provided services, on whom Employee called, with whom Employee became personally acquainted, or with whom Employee worked during employment with Employer, nor shall Employee make known to any competitive person or business entity, either directly or indirectly, the names or addresses of any such customers or any information relating in any manner to Employer's trade practices and secrets or business relationship with such customers, for a period of two years beyond the date of Employee's employment termination. Notwithstanding any other terms herein, the non-solicitation and non-disclosure covenant contained in this paragraph shall apply throughout the continental United States, and shall not be limited to any other geographic territory or radius defined elsewhere in this agreement.

9. **Severability.** Any paragraph, sentence, phrase, or other provision of this Employment Agreement that is in conflict with any applicable statute, rule, or other law shall be deemed to be modified or altered to conform to the applicable statute, rule, or other law, if possible, or, if not possible, to be omitted from this Employment Agreement. The invalidity of any portion of this Employment Agreement shall not affect the force or effect of its remaining portions.

10. **Governing Law.** The validity, interpretation, and enforcement of this Agreement shall be governed by the laws of the State of Arkansas. This Agreement shall be construed without regard to any presumption or rule requiring construction against the party causing this document to be drafted. If any provision of this Agreement or the application thereof to any party is held invalid or unenforceable for any reason, the other provisions of this Agreement and their application shall be unaffected thereby, and shall remain in full force and effect.

Employment and Non-Compete Agreement
Page 5 of 5

Employee, to the full extent permitted by law, hereby knowingly, intentionally, and voluntarily, with and upon the advice of competent counsel, (i) submits to personal jurisdiction in the State of Arkansas and venue of Woodruff County over any suit, action, or proceeding by any person arising from or relating to this Agreement and (ii) agrees that she will not bring any action, suit or proceeding against Employer in any other forum. Employee further consents and agrees to service of any summons, citation, complaint or other legal process in any such suit, action, or proceeding by registered or certified U.S. Mail, return receipt requested, or postage prepaid, addressed to her at the address set forth above, and consents and agrees that such service shall constitute in every respect valid and effective service (but nothing herein shall affect the validity or effectiveness of process served in any other manner permitted by law).

11. **Counterpart Execution.** This Employment Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.

12. **Entire Agreement.** This Employment Agreement constitutes the entire understanding between Employee and Employer relating to the employment. This Employment Agreement shall be binding on and shall inure to the benefit of the parties to it and their respective heirs, executors, administrators, legal representatives, successors, and assigns, and shall inure to the benefit of the affiliates of Employer and their respective successors and assigns.

AGREED AND ACCEPTED BY THE UNDERSIGNED, WHO HAVE READ THE FOREGOING DOCUMENT, HAVE HAD THE OPPORTUNITY TO REVIEW IT WITH THEIR CHOSEN COUNSEL, FULLY UNDERSTAND IT, AND WHO INDIVIDUALLY WARRANT THEIR AUTHORITY TO EXECUTE IT AS OF THE DATE ABOVE.

CGB DIVERSIFIED SERVICES, BY:

Signature

Jeff Baumgert
Printed Name

EMPLOYEE BY: Vernita K. Moreland

Signature

Vernita K. Moreland
Printed Name